The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Haigh. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except for the modification of attorney fees.
*******************
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff, who is sixty-one years old, has a sixth grade education and can read and write, but not very well. He lost his right eye when he was two years old and thereafter has worn a patch over the right eye socket.
2. Prior to 1969, his employment history includes driving milk routes for about six to eight years, racking billiards and occasionally serving drinks for about two years in a pool hall, stripping bobbins in cotton textile mills for about three to four years, working for Reeves Brothers for about two years, and working in a furniture manufacturing plant.
3. In 1969, plaintiff again worked for Reeves Brothers, defendant-employer Foamex's predecessor company, and worked through 14 October 1991. At some time, which is undeterminable from the evidence of record, but which was prior to 14 December , 1989 and which continued through 14 October , 1991, defendant-employer Foamex owned the plant in which he worked. That plant manufactured polyurethane foam for such products as foam matting for automobiles, furniture, and mattresses.
4. For two (2) years, beginning in 1969, plaintiff worked in re-bond where he mixed ground up foam. He thereafter worked about twenty (20) years, through 14 October , 1991, in the foam department (UBK department). For the last ten-twelve (10-12) years of that period of employment, he was an assistant foam operator.
5. During the approximately twenty (20) years that plaintiff worked in the UBK department, part of the foaming process involved pumping Toluene Di-isocyanate (TDI) from 10,000 gallon tanks through a closed system of hoses into an area where it was mixed and reacted with other chemicals before being released into a trough containment. During the normal foam line operation, TDI fumes were released into the atmosphere wherein plaintiff and other employees worked. On one occasion in August 1989, sample monitoring from fixed locations and from samples of workers, revealed that at the UBK foam line airborne TDI concentrations were less than two (2) parts per billion. The OSHA permissible exposure level at that time was twenty (20) parts per billion.
6. In the years prior to as well as subsequent to 1989, approximately one time monthly the seal in the pump cracked, thereby allowing TDI fumes into the work area and about three-four (3-4) times monthly, one or two of the four exhaust system vents malfunctioned, also thereby releasing TDI fumes into the workplace. It is reasonably inferred that on those occasions, the levels of TDI concentrations in the work area atmosphere were higher than the level documented in August 1989. While the vents and cracked pump seals were repaired by the end of the shift, plaintiff continued to operate the machine on the foam line and the foam line process continued throughout the shift. When the seal cracked or the vents malfunctioned, plaintiff and other employees continued their job duties except that on such occasions, plaintiff had to walk away from the area about every five-ten (5-10) minutes because he "could not breathe" and he became "sick on his stomach". Within a couple of hours or by the next day, however, his breathing returned to its normal status.
7. As of June 1991, plaintiff had an approximately seventy year pack history of smoking cigarettes and as of the date of hearing in September 1994, he had quit smoking for a period of two months.
8. On 21 October, 1989, plaintiff was hospitalized with a history of malaise for three weeks with a runny nose, productive cough and moderate fever. During that hospitalization, he improved on antibiotic treatment for pneumonia and was discharged on 25 October, 1989, to continue on antibiotic medication for six days and cough medicine was prescribed. Subsequent to discharge, plaintiff continued to experience a cough for about two weeks.
9. On a 14 December, 1989 pulmonary function questionnaire which reflects that plaintiff's employer was Foamex, plaintiff reported being troubled by shortness of breath when hurrying on the level or walking up a slight hill. In addition, a pulmonary function test was performed and revealed slightly below normal pulmonary functioning.
10. Prior to on or about 22 December, 1989, plaintiff did not experience any breathing problems on a sustained basis. At the end of the shift on or about that date, a pressurized TDI hose "blew" thereby spewing TDI all over plaintiff and some co-employees. Plaintiff and the other employees thereafter showered in the bathroom and assisted with the cleanup of the TDI. Plaintiff became nauseous and that evening he experienced chills and a fever.
11. The following day, plaintiff returned to work where there was another spill of TDI and he remained sick for about two weeks by reason of which he was out of work January 3, 4, and 5 of 1990. His sickness included pneumonia or flu-like symptoms of a fever and his bones hurting. In addition, since those TDI spills, he has experienced shortness of breath, chest tightness, coughing, and wheezing, especially when re-exposed to TDI in his workplace which he was thereafter through 14 October, 1991. During that period, his breathing problems worsened to the extent that in his last year of employment, there was not much work that he could perform without his running out of breath, such as when walking up steps or lifting, and he "faked" doing his job. He noticed that he could breathe better when he was on vacation but that on the first day of returning to work following vacation, he started to "breathe hard" again. Otherwise, he did not notice a difference in his breathing problems when at work as opposed to being at home. Moreover, results of a pulmonary function test on 7 December, 1991 establish that his pulmonary functioning was well below normal and represented a medically significant decrement in his FVC and FEV-1 values as compared with those obtained on 14 December, 1989.
12. It is reasonably inferred that on or about December 22 and 23 December, 1989, plaintiff was exposed to levels of TDI concentrations in the workplace environment that were higher than the level documented in August 1989, during the normal foam line operation process.
13. Plaintiff was hospitalized from about 22 April, 1991 to 29 April, 1991, during which admission he underwent gallbladder surgery and he remained out of work until 21 June , 1991. In May 1991, he developed seizures for which he was placed on Dilantin.
14. Because of plaintiff's low breathing capacity, defendant-employer sent him to Dr. Loper, to whom he presented on 6 June, 1991 with complaints of shortness of breath on exertion, cough, and some sputum production and a history of his breathing having been bad since the December 1989 "big spill" of TDI. Pulmonary function testing performed between 6 June, 1991 and plaintiff's next visit on 18 June, 1991, revealed an obstructive ventilatory defect with an FEV-1-FVC ratio of 45-48 percent, air trapping, and a markedly decreased diffusion capacity and also revealed a reversible component to his air flow obstruction with an increase of his FEV-1 to 1.6 liters after the use of a bronchodilator. On June 18, plaintiff was given a peak flow meter to take to work to record his peak flow serially throughout the shift and throughout the evening to determine any pattern he may have to chronic air flow obstruction.
15. Dr. Loper thereafter saw plaintiff on several occasions, the last of which was on 26 September, 1991. Plaintiff's peak flow assessment, which was measured after he returned to work on 21 June, 1991 but which was interrupted by his having a seizure on 25 July, 1991 and being out of work until 26 August, 1991, was quite unrevealing with peak flows consistently in the 200 to 350 range and they were not associated with either home or work. However, Dr. Loper suspected that plaintiff had enough fixed obstructive defect that he would not manifest the marked variations in flow rates one would expect to find from a hyper-reactive airway. Dr. Loper prescribed bronchodilator medication in order to taper plaintiff off of Prednisone which he was then on daily and he continued him on other bronchodilator medications. In addition, he gave him Nicorette gum to help him quit smoking, which Dr. Loper had recommended that he do at the June 18 visit. Dr. Loper further recommended that plaintiff not be exposed to any level of TDI. A copy of Dr. Loper's 26 September, 1991 office notes was sent, at an undeterminable time, to Fred Swiger, defendant-employer's Human Resources Manager.
16. Plaintiff, who had again returned to work on 26 August, 1991, continued working at his regular job and continued to be exposed to at least low levels of TDI in his employment through 14 October, 1991, the last date that he worked for defendant-employer. His average weekly wage amounts to $471.08 ($18,506.74 divided by 39.2857 weeks during the period from 15 October, 1990 through 14 October , 1991, less all periods of eight or more consecutive days which he did not work).
17. On 15 October, 1991, plaintiff, Sherrie Mayhew, who was a laboratory worker for defendant-employer and Fred Swiger, met at which time Swiger told plaintiff he no longer needed to work in the UBK department because of his breathing problems and offered him a job operating a fork lift in the shipping department. Plaintiff, who knew the duties of that job included getting on and off the fork lift and lifting items onto the fork lift blades, told Swiger that he could not operate the fork lift whereupon Swiger advised plaintiff he would have to take a medical leave of absence for one year or be fired. Plaintiff opted to take the leave of absence. No other job was offered to him at that time or thereafter.
18. Plaintiff experienced another seizure in October 1991 and was hospitalized from 12 November, 1991 to 21 December, 1991 by reason of Dilantin toxicity (due to over prescription of Dilantin dosage by a physician) which resolved during that admission. Plaintiff continues to take Dilantin which controls his seizure condition. In November 1991, he developed ulnar neuropathy which he continues to experience and in December 1991 he developed deep venous thrombosis.
19. Plaintiff, who wanted a second opinion concerning his pulmonary condition, saw Dr. Kelling, Jr. in November 1991 and thereafter remained under his care through the May 1995 deposition of Dr. Kelling. As of May 1995, plaintiff's pulmonary condition, that being moderate, permanent pulmonary impairment, had been stable since he began treatment by Dr. Kelling in early 1992.
20. TDI is a known respiratory irritant which can cause a person exposed to it to develop hyper-reactive airways disease with one or all of the following symptoms: cough, shortness of breath, chest tightness, and wheezing. However, not everyone exposed to TDI develops symptoms because the genetic differences render some people sensitive to the chemical whereas others are not sensitive.
21. Plaintiff developed chronic obstructive pulmonary disease with two components: an emphysematous component due to his cigarette smoking; and a hyper-reactive airways disease component due to his exposure to TDI in his workplace. The credible, medical evidence fails to establish, with any degree of medical certainty, the extent, whether "predominant", "majority", or "percentage wise", of the relative contributions to plaintiff's chronic obstructive pulmonary disease or the resultant impairment from cigarette smoking and from TDI exposure. However, the evidence does establish that plaintiff's exposure to TDI at his workplace, significantly contributed to or was a significant causal factor in the development of his chronic obstructive pulmonary disease and said employment placed him at an increased risk of contracting chronic obstructive pulmonary disease as opposed to the public in general.
22. In view of plaintiff having developed his pulmonary symptomology following the December 1989 spills of TDI and in view of his continued exposure thereafter to TDI through 14 October, 1991 with increasing pulmonary symptomology, when considered with the nature of TDI induced hyper-reactive airways disease, and considering the objectively documented and medically determined significant decrement in pulmonary function during the interim from 14 December, 1989 to 7 December, 1990, the spills of TDI on or about 22 and 23 December, 1989 and/or his continued exposure thereafter to TDI, it is reasonably inferred that plaintiff's hyper-reactive airways disease was augmented while he was in defendant's employment.
23. The fork lift job offered by defendant-employer to plaintiff on 15 October, 1991 was not suitable to plaintiff's physical capacity by reason of his breathing problems. Plaintiff has performed no work for wages since 14 October, 1991 and he has not sought any employment because he was not aware of any job he could do in view of his breathing problems and his prior work experience.
24. As a result of his chronic pulmonary disease, plaintiff is precluded from any exposure to TDI and from any exposure to other gases, fumes, dust, and chemicals, if any, which would or may irritate his lungs. Moreover, he retains respiratory impairment which precludes him from performing strenuous work or even moderate physical exertion on a sustained basis and he experiences shortness of breath upon walking more than one block or upon performing minimal exertion activity such as bending or stooping.
25. Considering plaintiff's rather advanced age, vocationally wise, his employment history involving unskilled work which did not furnish him with transferable or marketable skills, and his marginal education in conjunction with his chronic obstructive pulmonary disease and resultant impairment and environmental limitations, he has been permanently unable to earn any wages in any employment since 15 October, 1991, independent of his other physical problems and the limitations imposed thereby which prior to 15 October, 1991 did not render him unable to earn any wages in his employment. In view of the foregoing, a job search by plaintiff would have been fruitless.
*******************
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's exposure to TDI in his employment in the foam processing line significantly contributed to or was a significant causal factor in the development of his chronic obstructive pulmonary disease. His chronic obstructive pulmonary disease is due to causes and conditions which are characteristic of and peculiar to his particular employment. Furthermore, said chronic obstructive pulmonary disease is not an ordinary disease of life to which the general public is equally exposed outside of the employment. Plaintiff's chronic obstructive pulmonary disease, accordingly, constitutes an occupational disease.
N.C. Gen. Stat. § 97-53(13).
While defendant, in its statement of contentions, has advanced the propositions that at most, plaintiff sustained an injury by accident when the TDI spills occurred in December 1989 at which time he became sensitized to TDI but that because his workers' compensation claim was not filed within two years thereof, it is time barred pursuant to the provisions of N.C. Gen. Stat. § 97-24 and that a disease occurring as a result of accident is compensable as an accident, but not as an occupational disease, the undersigned finds and concludes that that latter proposition is unpersuasive. As stated at page 472 by Chief Justice Sharpe, when speaking for the majority in the seminal decision involving the provisions of N.C. Gen. Stat. § 97-53(13), the case of Booker v. Duke Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979):
 If an employee contracts an infectious disease as a result of his employment and it falls within the general definition of `occupational disease' in N.C. Gen. Stat. § 97-53(13), it should be treated as a compensable event regardless of the fact that it might also qualify as an `injury by accident' under N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was last injuriously exposed to the hazards of his occupational disease while in the employment of defendant-employer. N.C. Gen. Stat. § 97-57.
3. The job offered by defendant-employer to plaintiff on 15 October, 1991 was not one which was suitable to his capacity. N.C. Gen. Stat. § 97-32.
4. As a result of the occupational disease giving rise hereto, plaintiff has been permanently totally disabled since 15 October, 1991. His average weekly wage amounts to $471.08 and his corresponding compensation rate is $314.07. Plaintiff, accordingly, is entitled to compensation benefits at the rate of $314.07 per week commencing on 15 October, 1991 and continuing thereafter for his lifetime, subject to a credit in the amount of $1,365.00 to which defendant-employer is entitled to by reason of payment made pursuant to its private disability insurance plan. N.C. Gen. Stat. § 97-2(5); N.C. Gen. Stat. § 97-29; and N.C. Gen. Stat. § 97-42.
5. Defendant-employer is responsible for medical compensation incurred or to be incurred by plaintiff for treatment of the occupational disease giving rise hereto as reasonably required to give relief from said occupational disease. N.C. Gen. Stat. § 97-59 and N.C. Gen. Stat. § 97-2(19).
*******************
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to counsel fee hereinafter approved, defendant-employer shall pay compensation to plaintiff at the rate of $314.07 per week commencing on 15 October, 1991 and continuing thereafter for his lifetime, less a credit to which defendant-employer is entitled to in the amount of $1,365.00. As much of said compensation as has accrued shall be paid in a lump sum without commutation.
2. A reasonable attorney fee in the amount of 25% of the compensation benefits payable herein is hereby approved for plaintiff's attorney. Said attorney fee shall be paid out of the accrued benefits and thereafter out of the benefits which accrue by defendant-employer making direct payment to counsel of every 4th week of compensation benefits payable under the terms of this Opinion and Award.
3. Defendant shall pay all medical expenses incurred or to be incurred during plaintiff's lifetime for treatment of his occupational disease to provide relief therefrom.
4. Defendants shall pay the costs, including an expert witness fee in the amount of $250.00 to Dr. Loper and in the amount of $300.00 to William Haney, Vocational Rehabilitation Consultant.
This the 13th day of August 1997.
 S/ _______________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ______________________ MORGAN CHAPMAN DEPUTY COMMISSIONER
CMV:db